309 So.2d 659 (1974)
FOUR STATES REALTY CO., INC.
v.
CITY OF BATON ROUGE et al.
CITY OF BATON ROUGE
v.
FOUR STATES REALTY CO., INC.
Nos. 55298 and 55410.
Supreme Court of Louisiana.
December 2, 1974.
On Rehearing March 17, 1975.
Rehearing Denied April 3, 1975.
*660 Joseph F. Keogh, Parish Atty., Baton Rouge, for defendant-appellant in No. 55298 and for plaintiff-relator in 55410.
Robert L. Roland, Watson, Blanche, Wilson & Posner, Baton Rouge, for plaintiff-appellee in No. 55298 and defendant-respondent in No. 55410.
R. Gordon Kean, Jr., Sanders, Miller, Downing & Kean, Baton Rouge, for intervenor-relator in No. 55410 and for intervenor-appellant, B. R. Bank & Trust Co. in No. 55298.
SUMMERS, Justice.
A comprehensive zoning ordinance was adopted by the City Council of the City of Baton Rouge on July 19, 1950. Zoning regulations and districts were established. The ordinance, with changes, was reenacted effective in October 1958. Zoning regulations and districts were again created in accordance with a comprehensive plan to promote the health, safety, morals and the general welfare of the community. They are designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to provide adequate light and air; to prevent overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements.
At the time, the regulations and districts were designed with reasonable regard, among other things, for the character of the district, and its peculiar suitability for particular uses; and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the community.
The area involved in this litigation is situated along the banks of the Mississippi River and comprises the central business district of the city. Here the city was born in 1719. It is "downtown", and since 1971 the locality has been referred to as the Riverside Area in an attempt to focus on the Mississippi River as an inspirational *661 characteristic. Today it is bounded on the north by the grounds occupied by the State Capitol and the complex of state buildings located there. The new Civic Center for the Greater Baton Rouge area lies to the south. An interstate highway bounds the area on the east. The mighty Mississippi flows on the west.
Within these limits lies densely populated commercial property in the heart of the central business district. Riverside also contains three major levels of governmental organization: a small Federal complex at the post office building, a rapidly growing State complex centered around the State Capitol Building and a Parish group with the newly designed Government Civic Center Complex at its heart. Riverside contains the best of the past heritage of Baton Rouge, is undergoing a rapid economic growth at present, and is the center of the hopes of the people of that city for a strong and prosperous future.
By the terms of the 1958 ordinance, the area involved here was contained in a district zoned C-5. This permitted the general use of the property allowed in other higher zoned districts, and, in addition, authorization was provided for such uses as: assembly plants, barge loading repairs and fabrication, canneries (except meat and fish products), cellophane products manufacturing, concrete mixing or batching plants, foundry casting, grain elevators, ornamental ironworks (no foundry, drop hammer, and no punch presses over 20 tons capacity), paint mixing and treatment (not employing a boiling process), bulk terminals for petroleum products, poultry processing plants, and a variety of other manufacturing activities.
In 1967 the City-Parish Council, upon recommendation of its Planning Commission, authorized a study of traffic and parking conditions in the central business district. This study was made by a firm of architects and planning consultants with the cooperation of all agencies of the City-Parish government and the Louisiana Department of Highways. The data and projections developed during the study disclosed a very significant future increase in traffic congestion and a decrease in parking capacity.
Predicting that the future of Baton Rouge and its central business district would be one of remarkable and unprecedented growth, the study considered the current and future problems. By the year 1985, according to the study, the then existing traffic volume in the central business district would be over two times the 1967 volume. A finding bearing upon this case
"... revealed that many persons parked in overcrowded and sub-standard lots, in lots where attendants crowd automobiles into every available niche, where customer service and convenience are sacrificed in the interest of merely having a place to park. Many persons park illegally on the streets, overpark at meters, and occupy metered curb space continuously for several hours."
Clearly the acute parking problem has been one of long standing. Included in a comprehensive plan to cope with this condition, the study recommended that on-street parking be eliminated as soon as adequate off-street parking facilities could be provided.
In October 1971 an ordinance was adopted by the City-Parish government in which it proclaimed the Mississippi River as one of its greatest assets. Citing the example of St. Louis, Memphis and other cities which capitalized on riverside locations, and the development of that asset into a major resource for educational, recreational, cultural and economic betterment, the ordinance announced that Baton Rouge had not properly understood the great potential of and had not employed and developed its "Riverside Area".
Development and expansion by the State of Louisiana of its riverbank in the governmental *662 complex surrounding the State Capitol Building was recognized. The City-Parish acquisition and development of a multi-purpose Civil Center was also acknowledged. The Old State Capitol Building serving a major part of the City's cultural activities was also adjacent to Riverside. Streets and sidewalks were being resurfaced, ornamental light standards and subsurface wiring installations were in progress. A plan of beautification was being undertaken with a mall, trees and decorative sidewalks. All these factors, the ordinance declared, presented an opportunity for the people of the city to undertake a program of renewal, improvement and betterment, the elimination of unsightly and run-down structures and to accomplish solutions of parking problems.
To encourage, promote and assist in this endeavor, the area was named "Riverside"; a symbol or logogram was authorized to identify and publicize the area. Street names were changed to conform with the "Riverside" concept, while historic and architecturally significant buildings were identified as part of the Riverside area. Businesses and all others in the area were memorialized to undertake a comprehensive program of renewal and revitalization. A color chart was authorized to serve as a guide for this effort. "The Riverside Association", a combination of business and professional interests, was designated to serve as a coordinating body. The ordinance contemplated that interested agencies would be kept informed, would be consulted and would assist in the plan of development and improvement the ordinance envisioned.
In part, the implementation of this declaration of public policy was undertaken by the City-Parish Planning Commission. An 8½ month study by that body ended in January 1974. The purpose of the study was to investigate the downtown area which was undergoing tremendous land and building-use changes. In its findings, the Commission recounted the history of the central business district, observing that since creation of a shopping center outside the central business district in 1960, downtown Baton Rouge was no longer the trade center. As a result many retail establishments relocated outside the area. Many believed the downtown area was dead. To others this signified a change in the dominance of functions in the area.
Three events of the early sixties served to indicate the growth potential of Riverside: The interstate highway was constructed making Riverside easily accessible from all points, the expansion of the State Capitol complex served to strengthen Riverside as the seat of State Government, and the construction of a 22-story office building forecast Riverside's resurgence as a major business center.
A proposed government Civic Center begun in April 1973, expansion of the state capitol complex, designation of the city as a national Bicentennial City, construction of a 25-story office building, extensive renovation of buildings and landscaping in the area, street improvements and the preservation of historic or visually significant structures all served to add to the revitalization of Riverside.
The study's comprehensive analysis of the area's major handicaps included recommendations to alleviate transportation and parking problems. As a primary objective, it proposed that zoning ordinance changes should be made to require that all new construction in C-5 commercial zones provide for its parking demands.
Four States Realty Company, Incorporated, is the plaintiff in these proceedings. Four States builds and constructs bus terminals which it leases to its sister corporation popularly known as Continental Trailways, a combination of two bus transportation businesses. The bus station site formerly in use by Continental was expropriated by the city for the Civic Center development on February 14 and March 7, 1974, and Four States acquired a new site described *663 as lots 6, 7 and 8 of Square 6, Hickey, Duncan, Mather Town. The site measures approximately 148.5 feet front on the south side of Convention Street by a 291.6 foot depth along the west side of North 7th Street. This property is located in the Riverside Area, and at the time of acquisition was in a district zoned C-5.
The lots are to be used as a commercial bus terminal. They are located immediately north of the main banking facilities of Baton Rouge Bank & Trust Company, separated only by Convention Street. Buses will travel along Convention Street to gain access to the terminal.
The United States Post Office Building and its adjacent parking facilities are located immediately across North 7th Street to the east. The United States Courthouse is just to the north and east. The First Presbyterian Church is to the south and the First Baptist Church is one block to the west. All of these localities are major traffic generators; each provides the needed off-street parking its use requires.
It is evident that unless Four States provides adequate off-street parking on its site for its customers, employees and those required to stop at the bus terminal, unauthorized use of the private off-street parking provided by others in the neighborhood will result.
This prospective shifting of the parking burden to their parking lot and to other lots in the neighborhood and the consequent disruption of the planned renewal program of Riverside caused the Baton Rouge Bank & Trust Company to file an application on February 18, 1974 to rezone the Four States property from C-5 to C-2. C-2 zoning requires one parking space for each 400 square feet of floor area. In a C-5 district no parking space need be provided. Thereafter, on February 20, 1974, the Bank applied to the Zoning Commission to rezone all of Square 6, including the three lots acquired by Four States. The applications were rejected for want of the requisite signatures of the property owners affected.
After much deliberation and controversy over the rezoning of the Four States property, Council action resulted in the adoption of an ordinance on June 26, 1974, rezoning the Four States property to a C-4 Highway Commercial District, requiring one parking space for each 200 square feet floor space and front and side yard offsets. The ordinance, moreover, declared the City's public policy "to rezone for the public good and in the best interest of the public all property lying within the boundaries of that area know as the `Riverside Area'".... "wherever such rezoning is deemed appropriate and proper within the sound legislative discretion of the Council, and that the Planning and Zoning Commission has been requested by previous action of this Council to review and make recommendations for such rezoning where appropriate."
Two days prior to the adoption of the ordinance, on June 24, 1974, Four States obtained a building permit. According to the site development plans for the terminal, 19 parking spaces will be provided, which would satisfy the C-5 zoning requirements. On the other hand, 38 parking spaces are required by the C-4 zoning regulation. Set back and side yard restrictions were also required by the C-4 classification, whereas none are necessary in a C-5 zoning district.
Shortly after the ordinance was adopted, Four States filed suit on July 1, 1974 against the City, the Council and its members (the individual members were later dismissed) seeking to enjoin the enforcement of the ordinance of June 26, 1974 which rezoned its proposed building site. The Bank, Four States and the interrelated corporations of Four States, Continental Southern Lines, Inc., Continental Trailways, Inc., and TCO Companies, Inc., intervened. After hearings, judgment was *664 rendered in the trial court declaring the ordinance unfair, unreasonable and arbitrary and therefore unconstitutional. Accordingly, a decree was entered enjoining its implementation or enforcement. The City and the Bank appealed, and a preferential hearing was granted.
On this record, it is manifest that the C-5 zoning regulations, if unaltered, will not promote the revitalization and upgrading of Riverside envisioned by the City-Parish government. The uses permitted by C-5 zoning would not only burden this concept, but would, to the contrary, result in downgrading the planned improvements. No provision for off-street parking is found in the C-5 zoning, and there is no front yard set back, side yard, or minimum lot width requirement. Zoning under the C-5 regulations permits boundary to boundary building construction.
On the basis of this record it cannot be said that the reclassification of the Four States property was not justified; nor was the action capricious or unreasonable. This action was the beginning of a much needed change, a fair and rational decision to adjust and resolve the immediate problem at hand. To permit Four States' change in use to violate the planned improvement simply because it came first would compromise the plan from the beginning.
We believe the plan of revitalization, improvement and upgrading of the Riverside Area is real, viable and in being in the city of Baton Rouge. Because the necessary explicit ordinance establishing the details of that plan were not yet enacted in this transitional period, the City was not powerless to implement its declared policy in this instance simply because it involved only one property owner. A starting point in fulfilling the improvement concept was compelled by Four States' commendable urgency to reestablish a bus terminal. No unreasonable invasion of Four States' rights are involved.
The ordinance seeks to compel conformance with a plan designed for the good of the entire community by a reasonable regulation. The diverse established uses to which the property had been put in Riverside Area over the years were not subject to a comprehensive change in zoning regulation effective immediately because of the nonconforming use they acquired. Only changes in use were subject to the planned upgrading of the area by zoning changes as the changes in use occurred. For only when properties are put to new uses do they lose their nonconforming status and become subject to rezoning. Thus the rezoning will be piecemeal as the existing nonconforming uses are abolished. It is not unreasonable, therefore, to rezone Four States at this stage before it acquires a nonconforming use and can no longer be compelled to upgrade its property by retrospective zoning.
Municipal authority to enact zoning regulations is derived from the police power of the governmental authority; it is legislative in nature and the adoption of such an ordinance is a legislative matter. State ex rel. Civello v. City of New Orleans, 154 La. 271, 97 So. 440 (1923); State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613 (1929).
Courts will not interfere with that legislative prerogative unless it is plain that the action is palpably erroneous and without any substantial relation to the public health, safety or general welfare. City of Shreveport v. Conrad, 212 La. 737, 33 So.2d 503 (1947); City of Shreveport v. Bayse, 166 La. 689, 117 So. 775 (1928).
A presumption exists in law that an ordinance adopted by a legislative body exercising its police power is valid; the burden of proving the contrary is on him who asserts the invalidity or nullity. City of New Orleans v. Beck, 139 La. 595, 71 So. 883 (1916); Ward v. Leche, 189 La. 113, 179 So. 52 (1938); Meyers v. City of *665 Baton Rouge, 185 So.2d 278 (La.App. 1966); Archer v. City of Shreveport, 85 So.2d 337 (La.App.1956).
Generally, the rules by which the validity of an ordinance is determined are also applicable to an amending ordinance. See Meyers v. City of Baton Rouge, supra; also Kissinger v. City of Los Angeles, 161 Cal.App.2d 454, 327 P.2d 10 (1958); Bliss v. City of Fort Worth, 288 S.W.2d 558 (Tex.Civ.App. 1956). The presumption of validity is not altered by the fact that an amendment to a zoning ordinance is involved. Levitt v. Incorporated Village of Sand Point, 6 N.Y.2d 269, 189 N.Y.S.2d 212, 160 N.E.2d 501 (N.Y.1959).
Zoning is not static. In recognition of this fact, Louisiana statutes specifically provide that the original regulations may be "amended, changed, modified or repealed." La.R.S. 33:4725.
The zoning changes at issue in the instant case, on the authority cited, are presumed to be valid, and the burden of proving the contrary rests upon the party attacking the amendment. No evidence was offered by Four States to refute the inadequacy of off-street parking in the Riverside Area, nor has it refuted the need for revision in the C-5 classification to cope with the parking problem and eliminate inconsistent uses in the already partially revitalized area. Instated, Four States has rested its case primarily upon the proposition that its acquisition of the terminal site occurred while the property was zoned C-5, and the change to C-4 zoning would affect the use to which it proposed to put the property.
The mere acquisition of property under a particular zoning classification in a municipality creates no vested right in the absence of a nonconforming use acquired in accordance with recognized standards. Restrictions on the use to which property may be put by municipal authority, standing alone, do not foreclose a zoning change. Zoning is but an exercise of the police power and all owners in a municipality hold their property subject to a reasonable exercise of that power. For example, in Ransome v. Police Jury of Parish of Jefferson, 216 La. 994, 45 So.2d 601 (1950), prior to the enactment of a zoning ordinance, the property owners commenced construction of a building for commercial purposes. When the ordinance was enacted restricting the contemplated use of their property, they sought to enjoin its enforcement "because the zoning ordinance would be retroactive" if applied to their property. Although their deed specifically recited that the property could be used for commercial purposes, we denied relief holding that the deed provision was
"... nothing more than a declaration on the part of the vendor that on the date of purchase there existed no legal impediment against the use of the property for commercial purposes, and cannot possibly be construed as a warranty that the property would at no time in the future be zoned by the police jury under constitutional authority permitting such zoning."
In addition, the Ransome Court declared, "it is well settled that everyone holds his property subject at all times to every valid exercise of the police power, and the adoption of such an ordinance (zoning)... is undoubtedly a valid exercise of the police power." The proposition is supported by Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096 (1948), in which the United States Supreme Court said: "But in no case does the owner of property acquire immunity against exercise of the police power because he constructed it in full compliance with existing laws."
In order to justify a holding that the legislative action is arbitrary, capricious and unreasonable, it must be shown that there was no room for a reasonable *666 difference of opinion, and that there was no substantial evidence upon which the legislative action could have been justified.
There is substantial and weighty evidence here to justify the zoning reclassification; and the imposition of reasonable restrictions on the use of the property, which were not applicable at the time the property was acquired, is no cause to invalidate the Council action. There was also room for a difference of opinion here as demonstrated by the close three-to-four vote of the Council on several occasions before it cast the five-to-two vote required for passage.
Without again detailing the chronology of events relating to the zoning change, it is clear that the Council had this matter under intensive consideration for many months before it took final action. Before its decision, the Council heard and received much information, pro and con, concerning the need for the change. Its action was deliberate, not hasty, and nothing in the record supports a conclusion that it was arbitrary or capricious. The reference by the trial judge to "political pressure" was nothing more than the democratic process at work. Expressions of opinion to the Council for and against the change were voluminous and came from many sources. By this means a legislative body learns the will of the people and determines what is for the public good. Because legislative action is a manifestation of the will of the people, every presumption of law and fact must be indulged in favor of its constitutionality. State v. Guidry, 247 La. 631, 173 So.2d 192 (1965). For these reasons, the actions of legislative bodies should not be set aside unless palpably arbitrary and capricious.
`"The terms `arbitrary and capricious action', when used in a matter like the instant one, must mean willful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case. On the other hand, when there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached."' Rathkopf, The Law of Zoning and Planning, 3rd ed. 1974, Cumulative Supp. Vol. 1, pages 2-26.
Tested by this standard, it cannot fairly be said that the action of the City was "willful and unreasoning action, without consideration and regard for facts or circumstances." It is otherwise. The evidence demonstrates convincingly that the authority of the Council was "exercised honestly and upon due consideration."
Four States' contention that the zoning amendment should be declared invalid because only its property was affected is without merit. Aside from the fact that the record does not support a contention that only its property has received special treatment in the city zoning regulations, spot zoning is not for that reason alone illegal. It depends upon the particular facts of each case, and on whether the municipality's action is properly related to the public health, safety, morals and general welfare, designed to serve the best interest of the community as a whole, and in accordance with a comprehensive zoning plan. Sears, Roebuck & Company v. City of Alexandria, 155 So.2d 776 (La.App. 1963).
The action taken by the Council was in furtherance of the plan to revitalize the Riverside Area. It was necessary to avoid further deterioration of acute parking conditions and to further the development concept for the entire area. Even though plaintiff's property was the first affected by the contemplated change in zoning regulations, it is evident from the record, and the action of the Council in ordering a zoning study of the entire area, *667 that other affirmative action was to follow, or that restrictions would be imposed as the need arose. The Council action was in furtherance of the health, safety, morals or the general welfare of the community. La.R.S. 33:4721.
Four States also contends that it acquired a vested right when the building permit was issued just two days prior to the zoning reclassification. The permit was obtained at a time when a public hearing on the rezoning application was scheduled and was being advertised. At the time, the controverted issue had been under active consideration by the Planning Commission and the Council for approximately six months. No showing has been made that expenditures were made in reliance upon the permit when the issue was brought to court and nothing was spent in reliance on the permit at the time of trial.
In the absence of a showing of substantial expenditures in reliance upon the building permit, there is no vested right to complete the building for which the permit was issued. Since the ordinance was amended two days after the permit was issued, Four States could only rely on the permit during those two days. Thereafter, faced with the zoning reclassification, Four States could no longer rely on the permit, for the two were in irreconcilable conflict. Faced with this dilemma, Four States could not prudently proceed. The issue is controlled by the holding in State ex rel. Manhein v. Harrison, 164 La. 564, 114 So. 159 (1927), where the Court made this pronouncement:
"The question is whether the council had a right to prohibit the issuance of permits previously applied for, though not granted, such as the permit in this case. We think that the council had such right. Every one holds his property subject to the police power. Because a person applies for a permit at a time when it might be lawfully granted does not give him a vested right to the permit. An ordinance may be validly passed after the making of such application which would prohibit the issuance of the permit." (emphasis added).
For the reasons assigned, the judgment of the district court is reversed and set aside. Ordinance No. 3234 adopted by the City Council of Baton Rouge on June 26, 1974 is valid and in full force and effect from the date of its enactment.
It is further ordered, adjudged and decreed that Four States Realty Company, Incorporated be and they are hereby prohibited, restrained and enjoined from using the property described in Ordinance No. 3234 in any manner contrary to the restrictions imposed in said ordinance.
It is further ordered, adjudged and decreed that this case be and the same is hereby remanded to the trial court in order that this decree and judgment may be implemented and enforced.
DIXON and CALOGERO, JJ., dissent.
BARHAM, J., dissents with reasons.
BARHAM, Justice (dissenting).
I must dissent from the majority opinion because I feel that the rationale behind it effectively permits zoning, or re-zoning, on a lot-by-lot basis. Such a practice is in direct contravention of a city's duty to exercise its police power of zoning in a reasonable manner.
Some significant facts were omitted from the majority's opinion. The only property zoned C-4 within an eighteen square mile area is the Four States property, which the ordinance in question rezoned from C-5 to C-4. All the other property in the area is presently zoned C-5 and the Four States property has been so zoned since 1950. The Four States property is in no way different from the surrounding *668 property that is zoned C-5. Additionally, on October 23, 1973, the City rezoned a site approximately six blocks to the east of the Four States property from C-2 to C-5 for use by Greyhound as a bus terminal; an identical use is intended by Four States for its property. The proposed building for the Four States property is adjacent to two public parking lots and the approved plans provide more parking spaces than the eighteen required by the City for the Greyhound bus terminal.
The majority also glosses over the reliance interest that Four States has in the property. The C-4 zoning requirements result in the use of over one-half of the property as parking or yard space, effectively precluding the use of the property as a terminal, as intended by Four States. In reliance upon the zoning that has existed since 1950, after Four States purchased the property it incurred expenses of some $16,410.00 in architect's fees, $1,000.00 in soil borings, and $286.25 for a topographical survey. In April, it had instituted proceedings to obtain a building permit. It secured the traffic engineer's approval regarding ingress and egress, as well as the respective approvals of the city and parish engineering departments, the State Fire Marshal, the State Health Department, and the City Department of Health. Prior to the passage of the ordinance on June 25, Four States had filed a formal application for a building permit on June 10 and had had its plans approved by the City and had been issued the building permit on June 24.
In my opinion, the decision of the trial court correctly characterizes the unreasonableness of the ordinance enacted by the City:
"* * * the reclassification of petitioner's property is unjustified and lacking in basic reasonableness and fairness. Certainly the zoning change bears no substantial relationship to the health safety, convenience, propriety or general welfare of the inhabitants in the surrounding part of the city affected. Since the uses permitted by both classifications are the same, it is extremely doubtful that the difference in the setback and sideyard restrictions required by a C-4 classification play a significant relationship to the health and safety of the inhabitants in the area. It is clear to the Court that the zoning change in question was directed solely and discriminatorily towards the plaintiff's property and for that reason the Court finds City Ordinance No. 3234 to be unreasonable, arbitrary and accordingly unconstitutional."
It is difficult for me to imagine a case in which a discriminatory, arbitrary and capricious action in the name of exercise of a police power could be more clearly evident from the facts. The zoning ordinance bore no substantial relationship to the health, convenience and general welfare of the citizens of Baton Rouge. It was directed at Four States alone, and not at the total development, as no other property owner in the Riverside downtown area is or has been required by ordinance to provide parking or to provide yards on all sides in connection with the construction of their facilities.
The effect of the majority's opinion is to defeat Four States' right to construct a building which is in total conformity with the zoning laws that prevail for the entire area in which the property is located. Moreover, the construction by Four States would be more esthetically appealing than nine-tenths of the buildings in beautiful downtown Baton Rouge. That opinion is from a very conservative viewpoint. Therefore, in my opinion, Four States has been unreasonably, arbitrarily, capriciously and intentionally discriminatorily deprived of the use of their property.
I respectfully but emphatically and categorically dissent.

*669 ON REHEARING
BARHAM, Justice.
This is an appeal by the City of Baton Rouge, defendant, and Baton Rouge Bank and Trust Company, Intervenor, from a judgment enjoining the City of Baton Rouge and the City Council of Baton Rouge from implementing City Ordinance No. 3234. That ordinance attempted to rezone Lots 6, 7 and 8 of Square 6, Hickey, Duncan, Mather Town, in Baton Rouge.
Four States Realty, Inc., the plaintiff, constructs bus terminals which it leases to Continental Southern Lines, Inc., referred to as Continental Trailways. The facility which had been used by Continental Trailways for many years was expropriated by the City-Parish government of Baton Rouge for further development of the Civic Center project. Continental Trailways commenced an extensive survey seeking an appropriate site for its Baton Rouge bus terminal. On February 14 and March 7 of 1974, Four States Realty purchased the lots in litigation in an area within the "Business District" of Baton Rouge, which has been zoned in essentially the same manner from 1950 to the present. By ordinance in 1958 the downtown business area of Baton Rouge was zoned C-5 Business District, and not a single parcel of ground in that area has been rezoned since that time. The trial court judge sets forth the facts surrounding this litigation as follows:
"The chronology of the effort ultimately leading toward the reclassification of petitioner's property is documented as follows: With knowledge of the acquisition of the property and proposed use, the Baton Rouge Bank and Trust Company on February 20, 1974, filed an application with the Planning and Zoning Commission for the City of Baton Rouge and Parish of East Baton Rouge, hereinafter referred to as the Commission, requesting that the property of petitioner, along with several other adjoining properties, be rezoned from C-5 to C-2. Interestingly enough, the banking facility rested upon property bearing the same C-5 classification. The application of the bank was rejected as not being signed by the owners of subject property. A second application by the bank was joined by a request from the owner of Lot 11 of Square 6 that they also be included in the application.
"On February 27, 1974, a request to rezone Lots 9, 10 and 12, along with several other properties in the same square was placed on the agenda of the City Council by Councilman Tommy Neck for pre-introduction for rezoning from C-5 to C-2. The council met on the 27th of February and called a public hearing for March 26, 1974, for the avowed purpose of rezoning the entire block from C-5 to C-2 and referred this to the Planning Commission for a recommendation. On March 25, 1974, the Planning Commission met and the result of their meeting was a denial for rezoning. While the vote was four yeas and three nays for a favorable consideration this was insufficient to form as a basis for a favorable vote according to the rules and the net result was a denial. On March 26, the Council called a public hearing and recessed the public hearing until April 23, 1974. On April 23, the Council again recessed the public hearing for two weeks. On May 8, 1974, a public hearing was held and concluded and an original motion was made to rezone Lots 6 through 12 from C-5 to C-4 followed by a substitute motion to rezone from C-5 to C-2, and both of these motions failed. Then, on May 13, 1974, a special council meeting was called and the Council included an item by Councilmen Watts, Gross and Neck to pre-introduce Lots 6, 7 and 8 for a public hearing on June 25, 1974. The Council at that meeting, however, actually requested that the Planning *670 Commission consider rezoning of Lots 1 through 12 from C-5 to C-4. Then, on May 22, 1974, the Council requested that the Riverside Study be made concerning all of the zoning in what has been commonly called the Riverside area. On May 24, 1974, the Planning Commission again recommended denial on Lots 6, 7 and 8, by a vote of 7 to 2. On June 25, 1974, the Council called a public hearing and this hearing was recessed until the regular zoning council meeting to be held on the next night, June 26, 1974. At this meeting on June 26, 1974, the public hearing was held and concluded and the amendments to the proposed ordinance were adopted resulting in the adoption of Ordinance of 3234 presently before the Court.
"An examination of subject property shows that it is situated on the corner of Convention and North 7th Streets in close proximity to the center of what has been commonly called the Central Business District of the City of Baton Rouge and now being designated as the Riverside area. This area is bounded on the north by Main Street, south by North Boulevard, east by Interstate 110 and west by Front Street. Until the present zoning change, all of the property from Front Street to North 7th Street, comprising twenty-four blocks, was zoned C-5, Business District, and had maintained the same or similar classification for the past 25 years.
"While there have been studies made relative to the improvement of traffic and parking in the downtown area, there have been no significant steps taken by either the Council or Planning Commission toward studying revision of zoning in the area until May 22, 1974, when the Council in connection with the reclassification of subject property moved in this direction. This action was taken only after a prolonged effort and what has been termed by Councilman Watts as `tremendous lobbying'. It should be pointed out that it was apparent that the effort to rezone petitioner's property was brought about not because of an adverse attitude toward the prevailing zoning, but because of petitioner's proposed use of its property. While the C-4 classification to which the property was zoned does permit bus terminals, the same as permitted by C-5, unlike C-5 it severely restricts the use of the property by imposing substantial front and back yard requirements, as well as sideline restrictions, thereby pretermitting any effective use by the petitioner of it."
Located in the immediate vicinity of the proposed site of the bus terminal is the main banking facility of the intervenor, Baton Rouge Bank and Trust Company, the United States Courthouse and Federal Building, the First Presbyterian Church and the First Baptist Church. Of these the only major generators of parking demand[1] are the Post Office and Federal Building which provide their own parking facilities.
It has been argued in this Court that the only reason for rezoning the parcel of land purchased by plaintiff for a bus terminal was to insure adequate parking facilities for a new parking generator in the downtown business district. It is not contended that the building proposed to be constructed by plaintiff is any less attractive than the construction which would be required
under the new C-4 zoning requirements. Plaintiff has incorporated in its plans for construction, in addition to the loading and parking spaces for its buses, nineteen off-street parking spaces for automobiles. While the defendant and intervenor argue that C-4 construction would require thirty-three spaces, it is also apparent that C-4 requirements would force plaintiff to make side-yard space available, which would be of no benefit to plaintiff nor would it provide parking. Construction in compliance *671 with C-4 requisites would actually waste valuable business district property.
The studies for Riverside, the new name for the business district of Baton Rouge, all call for the phasing out of ground-level parking lots so that that land area can be made more useful. The report of the Riverside development study states, "As multistory parking structures or other solutions to the downtown parking problems are implemented, many surface parking areas will be freed for other types of development. * * *"
The official traffic and parking report previously referred to states:
"All existing vacant land is already used for parking lots. Any significant expansion of facilities must be made above ground level, probably by means of multi-story parking garages."
It further states:
"* * * As can be seen from the plan, it is entirely possible that groundlevel parking lots will be practically eliminated from the core area during the next fifteen years. As the need for building sites increases, there simply will not be enough land to maintain the use of parking lots."
Whenever, during this controversy, the matter of rezoning of any lots in Square 6 has been placed before the Planning Commission (the investigatory and advisory body for zoning for the city), that commission has refused to recommend rezoning. Some of the findings of that commission in this regard are: that the area in which that square is located consists of 38 blocks of C-5 zoning extending from the river east to Eighth Street, between North Boulevard and North Street, which zoning classification was assigned in 1950 when the city zoning was first established; that the only changes that have been made are an eastward extension along North Boulevard to accommodate Louisiana Companies and the recent rezoning of the Greyhound site on Florida between Twelfth and Thirteenth Streets, actually outside the C-5 zoned area. The Planning Commission set forth certain guidelines and then criticized the proposed zoning in light of those guidelines.[2] It found that the rezoning which was requested in this case did not meet the test under its guidelines. Rezoning would have been unreasonable and not in the public interest. About the property in Square 6, the Commission states:
"* * * we find no physical or environmental conditions not contemplated by C5 Zoning and the particular site is actually better suited to C5 uses than is the property recently zoned to C5 on *672 Florida Boulevard, which site is almost entirely adjoined by residential uses."[3]
The Commission found no reason to make Square 6 an exception to the other thirty-eight squares of C-5 zoning; it felt that any change in zoning would be an unequal application of a police power and that C-5 zoning was the best zoning to serve the public interest in the Riverside area. It was the Planning Commission's final conclusion that special legislation zoning this land would constitute illegal "spot" zoning and would "set a dangerous precedent for similar punitive requests throughout the Parish." (Emphasis supplied.)
It was apparently the Planning Commission's view that the attempt at rezoning of the subject property was selfishly motivated by the intervenor and others to serve individual interests rather than the public interest. The trial court was of the same opinion, stating:
"* * * Further, it is interesting to note that the C-4 classification to which this property has been zoned bears the designation `Highway Commercial', which is slightly incongrous in view of the fact that Convention Street could hardly be classified as a highway and the Interstate lies two blocks away. In fact, Richard McEwen, the Planning Director, testified that the nearest existing C-4 or Highway Commercial zoning was located on North Foster Drive and on Airline Highwayseveral miles away. Consequently, it is obvious to the Court that the motivation prompting the study of zoning of the downtown area was supplied out of a need to justify the rezoning of petitioner's property more so than any other reason."
The authority to enact zoning regulations flows from the police power of the various governmental bodies; zoning is a legislative function. State ex rel. Civello v. City of New Orleans, 154 La. 271, 97 So. 440 (1923); State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613 (1921); Meyers v. City of Baton Rouge, 185 So.2d 278 (La.App. 1st Cir. 1966); Smith v. City of Baton Rouge, 233 So.2d 569 (La.App. 1st Cir. 1970). Courts will not and cannot substitute their wisdom for that of a legislative body or other zoning authority except when there is an abuse of discretion or an excessive use of power. However, the exercise of a police power in zoning cannot be made without substantial relation to the health, safety and general welfare of the public. City of Shreveport v. Conrad, 212 La. 737, 33 So.2d 503 (1947); City of Shreveport v. Bayse, 166 La. 689, 117 So. 775 (1928). All ordinances are presumed valid; whoever attacks the constitutionality of an ordinance bears the burden of proving his allegation. City of New Orleans v. Beck, 139 La. 595, 71 So. 883 (1916); Ward v. Leche, 189 La. 113, 179 So. 52 (1938). However, rezoning on a piecemeal or spot basis is highly suspect. Generally, property owners may rely upon the previous exercise of police power in zoning, expecting that changes in zoning will only be made so as to affect vested property interests when the change is required to assure the public welfare. A city purporting to act under its police powers cannot create in a large area of property zoned in one classification an island of one parcel of land relegated to another zoning classification when no rational reason exists for such a separate classification. 51 A.L.R.2d 311, Reynolds v. Barrett (1938), 12 Cal.2d 244, 83 P.2d 29.
We now examine the rezoning of these three lots in one block of the business district of Baton Rouge known as Riverside to determine if the plaintiffs have established an unreasonable and arbitrary exercise of police power without any substantial relation to the public health, safety and general welfare. The evidence in the record before us shows that all of the *673 land in the Riverside area has been zoned for C-5 use for twenty-five years. Land in a C-5 zoned area may be used for almost unlimited purposes, including assembly plants, barge-loading repairs and fabrication, canneries (except meat and fish products), cellophane products manufacturing, concrete mixing or batching plants, foundry casting, grain elevators, bulk terminals for petroleum products, poultry processing plants and numerous other manufacturing activities. C-5 zoning, as well as the proposed C-4 zoning, would permit use of the subject property for a bus terminal.
Although much argument has been advanced about the need for rezoning only this one spot of ground in all of Riverside, in order to provide adequate parking facilities, the method selected for increased parking is contrary to the legislative scheme for developing adequate parking and use of land in Riverside. The record establishes that all studies suggest that land is at a premium for the proper development of Riverside; therefore, the least land possible should be utilized for parking because parking only at street level utilizes too much land. Multi-level parking garages should be constructed in order that land may be better utilized for growth and development of places of business and residences in Riverside. While C-4 zoning requires additional parking spaces, it also requires front, back and side yards, which means more land must be left unused.
C-4 zoning is classified as highway commercial. This zoning is restricted to heavily trafficked through streets and highways. These streets and highways are located in areas where there is no on-street parking and no public parking lots. C-4 zoned land is ordinarily limited to a strip of land on each side of the street or highway, and may back up to residential areas or property of another character. It may be said that C-4 zoning is "strip" zoning along highways created to accommodate offstreet parking and to provide buffer zones to the sides and to the rear of the property for the protection of property which may be zoned in another classification. C-4 zoning is totally foreign to the usual concepts of the proper use for central business areas. It is wasteful of land where land space is at a premium.
A review of this record shows clearly that the original motivation for seeking the rezoning of the subject property was the selfish interest of the intervenor and perhaps a few other nearby property owners. They first sought to prohibit the building of a bus terminal in their neighborhood, which construction is permitted under the present zoning in the entire area. When they were unsuccessful in reclassifying the subject property as C-2, which zoning would have made unlawful the construction of a bus terminal, they then sought to make it as difficult as possible for the plaintiff to utilize the land purchased for a bus terminal. A C-4 classification wastes so much of the surface area that it may be totally unfeasible for the subject property to support a bus terminal. The official investigatory and advisory body to the Council in the area of zoning (the Planning Commission), recognized this rezoning attempt to be arbitrary, capricious, and unjustified spot zoning and found it contrary to the needs of the public in maintaining and developing the central business area known as Riverside.
Although no property within an eighteen square mile area is zoned C-4, the City of Baton Rouge has attempted to take three lots in the center of the central business area and classify them in this most unreasonable category. The new classification of this parcel of land has no relation to the public health, safety, or general welfare. It was not so reclassified to promote a solution to the parking problem of the central business area. Its reclassification would in fact be contrary to the over-all parking plans for this area.
The record clearly establishes that only the subject property has received special treatment in the city zoning regulations. The rezoning of the subject property is contrary *674 to what is purported to be a longterm comprehensive zoning plan. It does not further a plan of revitalization of the Riverside area. Rather, if all the property in the Riverside area were similarly zoned, the Riverside business area would suffer dramatically according to the evidence reflected in the exhibits. The action of the City Council of the City of Baton Rouge in rezoning these lots from C-5 to C-4 is clearly arbitrary and capricious.
For the reasons assigned, the judgment of the trial court is reinstated. City Ordinance No. 3234 is declared unconstitutional and its enforcement or implementation is prohibited. All costs of these proceedings are to be paid by the defendants and intervenor in No. 55,298, Four States Realty Co., Inc. v. City of Baton Rouge, et al., and by the plaintiffs in No. 55,410, City of Baton Rouge v. Four States Realty Co., Inc., as provided by law.
SANDERS, C. J., dissents, adhering to the views expressed by the court on original hearing.
SUMMERS, J., dissents for the reasons assigned in the original opinion of the Court.
MARCUS, J., dissents for the reasons set forth in our original opinion.
NOTES
[1] Traffic and Parking in the Central Business District, City-Parish Planning Commission, 1967.
[2] "1. `A property owner has the right to rely on the rule of law that a classification made by Ordinance may be changed only if the change is required for the public good.' In the subject case, opponents say that the proposed use will create noise and congestion, but if this is true, then all other uses which create noise and congestion or have inadequate off-street parking facilities should be treated in the same manner.

"2. `The power to amend is not capricious or arbitrary. It cannot be exercised merely because certain individuals want it done or think it ought to be done'. In other words, like property must be zoned alike and a legally permitted use should not be withheld from a particular property where all other properties in that district are unrestrained.
"3. `Before the Commission recommends or the Council rezones property, there should be reasonable proof (1) that the land use in the neighborhood has changed to such an extent, or (2) there is some mistake in previous zoning, that reclassification ought to be made.' Under the first part of this third guideline, land use change has consisted of a new Post Office soon to have bulk mail trucked in; expansion of major office buildings and churches with only limited expansion of parking; and the complete improvement of the Downtown Street System to allow greater traffic capacity and freedom of movement. Secondly, a change on this square would require change on all property in the same district if reasonable equity is to be maintained."
[3] The site referred to is the property zoned down from C-2 to C-5 in order to permit the Greyhound Terminal construction.