CANDICE HENDERSON-CHANDLER     *     NO. 2025-CA-0648

    *

VERSUS     COURT OF APPEAL

    *

CITY OF NEW ORLEANS AND     FOURTH CIRCUIT
THE NEW ORLEANS CITY     *
COUNCIL     STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2024-10656, DIVISION "F-14"
Honorable Jennifer M. Medley, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Dale N. Atkins, Judge Nakisha
Ervin-Knott)

William D. Aaron, Jr.
DeWayne L. Williams
AARON & GIANNA, PLC
201 St. Charles Avenue, Suite 3800
New Orleans, LA 70170

        COUNSEL FOR PLAINTIFF/APPELLEE, Candice Henderson-Chandler

Shawn Lindsay, Deputy City Attorney
Donesia D. Turner, City Attorney
1300 Perdido Street
City Hall - Room 5E03
New Orleans, LA 70112

        COUNSEL FOR DEFENDANTS/APPELLANTS, City of New Orleans and
New Orleans City Council

**REVERSED**
**MARCH 13, 2026**

DNA

RML

NEK

This is a zoning matter. Appellants, the City of New Orleans ("City") and the New Orleans City Council ("Council"), seek review of the trial court's August 11, 2025 judgment. In that judgment, the trial court granted the "Petition for Judicial Review of Adjudication of City Council Action (Writ of Review/Certiorari)" ("Petition for Judicial Review") filed by Appellee, Candice Henderson-Chandler ("Ms. Henderson-Chandler"); ruled the Council's denial of Ms. Henderson-Chandler's "Land-Use Request Application" ("Application") for a conditional use permit was arbitrary, capricious, an abuse of discretion, without consideration, and in complete disregard of the facts and circumstances of her Application; ruled the Council exceeded its authority, jurisdiction, purview, and discretion in violation of the Louisiana Constitution, Louisiana Revised Statutes, the Home Rule Charter, and City Ordinances in denying Ms. Henderson-Chandler's Application; reversed the Council's denial of Ms. Henderson-Chandler's Application; ordered the Council to effectuate an ordinance granting her a conditional use permit; and assessed the costs of the proceedings against the Council. For the following reasons, we reverse the trial court's judgment.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

In March 2021, Ms. Henderson-Chandler purchased the property located at 917-919 N. Tonti Street ("N. Tonti"), a double shotgun-style house in New Orleans' Treme neighborhood. In terms of zoning, the subject property is located in a HU-RD2 Historic Urban Two-Family Residential District. Oretha Castle Haley, who co-founded and served as the president of the New Orleans chapter of the Congress of Racial Equality ("CORE") in 1961, grew up in the home located at 917 N. Tonti. Additionally, during the Civil Rights era, the home housed Freedom Riders who protested the segregation of interstate transportation. In light of the property's history, Ms. Henderson-Chandler sought to convert 917 N. Tonti into a civil rights museum named the Freedom House Museum.

In April 2024, Ms. Henderson-Chandler submitted her Application in pursuance of same. Therein, Ms. Henderson-Chandler listed the specific zoning request as: "Requesting a Conditional Use Permit to operate 917 N. Tonti . . . as a cultural facility." In the "Description of Project" section of her Application, Ms. Henderson-Chandler wrote:

> The building on this property is a double shotgun constructed in 1924. The project requires no changes to the physical structure of this building. The building is notable for its historic role in the Civil Rights Movement, when it was a 'safe house' or 'freedom house' hosting visiting civil rights activists, advocates and artists. The owner proposes to operate the building as a cultural facility, in the form of a house museum honoring and teaching these histories, with events only within the hours of operations specified in the [Comprehensive Zoning Ordinance ("CZO")], 20.3.R (8 AM-10 AM Monday-Thursday, 8 AM-midnight Friday, Saturday and Sunday).

The City Planning Commission ("CPC") docketed Ms. Henderson-Chandler's Application as Zoning Docket ("ZD") 050/24.

2

As a peripheral issue in the court system, the family of Oretha Castle Haley sued to prevent Ms. Henderson-Chandler from using Oretha Castle Haley's name, image, likeness, and legacy in the Freedom House Museum. The family contended that doing so constituted a violation of the Allen Toussaint Legacy Act, which is codified at La. R.S. 51:470.1 - 470.6. In pertinent part, La. R.S. 51:470.4(A) provides that "[i]t shall be a violation of this Subpart for any person to use an individual's identity for a commercial purpose in Louisiana without having first obtained consent from the individual or the individual's authorized representative." Ultimately, the Haley family received a temporary restraining order and subsequent preliminary injunction against Ms. Henderson-Chandler, which prevented her from using the name, image, and/or likeness of Oretha Castle Haley and from representing the legacy of Oretha Castle Haley.

## CPC Staff Report

In August 2024, CPC staff issued their report to the CPC regarding ZD 050/24. Therein, the CPC Staff provided the following description of Ms. Henderson-Chandler's application:

> The subject property, located at 917 N. Tonti . . . in the HU-RD2 Historic Urban Two-Family Residential District, and the Tremé neighborhood, is developed with a historic shotgun double constructed in 1925. The site consists of one lot of record 31 feet wide and 110 feet long, with 3,875 square feet of area. The property is being used as a two-family residence, but the applicant is seeking to convert one side into a museum space called The Freedom House Museum. The house historically served as a "safe-house" or "freedom-house," hosting visiting civil rights activists, advocates and artists. The applicant is seeking a conditional use for a cultural facility . . . to utilize one side of the double as a museum dedicated to the site's civil rights history. The Museum will display memorabilia and information about the owners who housed over 375 Freedom Workers during the Civil Rights movements. This museum will also showcase historical interviews; intergenerational conversations; CORE's work to desegregate lunch counters, New Orleans CORE Chapter; the African American stories of the Civil Rights Movement connected

3

with the Freedom House and other important information to honor the Freedom Ride. The facility will be open to the public for tours, meetings or events by appointment only during normal business hours and no later than 9:00 pm on weekends. The applicant expects no more than 25 individuals for any booking.

The CPC staff next explained that because a "cultural facility is an institutional use," this "triggers the need for the site to comply with the lot requirements for non-residential uses."

The CPC staff addressed the "[a]nticipated impact on surrounding land uses" as follows:

The proposed use is compatible with the generally residential but mixed-use character of the surrounding neighborhood. . . . [W]hile the neighborhood is largely developed with two-family and single-family structures, more intense uses are scattered throughout the neighborhood . . . . The block for which the Freedom House sits is developed entirely with two-family structures, however across the street sits another institutional use, Metropolitan Baptist Church. The neighboring square across St. Philip Street includes a large senior housing complex and on the other side of the block, the neighboring square across Dumaine Street houses the Phillis Wheatley Community School. Willie Mae's Scotch House Restaurant is one block from the site (currently being redeveloped), and Dooky Chase Restaurant is just two blocks away from the site. While the area was developed primarily as residential, various restaurants, schools and larger housing developments exist in close proximity. The site's impact as a museum will be more intense than the existing residential use but is consistent with and complimentary to the surrounding neighborhood. The limited square footage of the proposed museum (approximately 900 square feet) would greatly limit negative impacts on surrounding properties.

The nature of the structure as a residential structure, and within a residential neighborhood, underlies its significance as a place of refuge during the Civil Rights Movement. It is because of its design and its location that it has such historical value and should be preserved and commemorated.

Then, the CPC staff delineated the ways in which the property did not meet the requirements for non-residential use in that district. First, the CPC staff noted the site was deficient in the number of square feet and the width of the lot. Second,

4

the CPC staff explained the side yards were also deficient in size. Third, the CPC staff pointed out that the property did not have the required vehicle parking spaces (three vehicle parking spaces were required based on the square footage). The CPC staff explained that Ms. Henderson-Chandler "has provided a commitment letter from Metropolitan Baptist Church to allow visitors of the Freedom House [Museum] to utilize the church parking area[s]." Regarding the church's parking areas, the CPC staff explained, they "are not developed as parking [lots] but are utilized for parking vehicles." The CPC staff further explained "there is at least one street parking space in front of the subject site which can be used for guests," but "the site still requires a waiver of the parking requirement to allow the use without vehicle parking spaces." Similarly, the CPC staff explained the site did not have the two required bicycle spots and spaces for electric vehicle ("EV") charging stations.

The CPC staff concluded that the proposed use met the approval standards in the CZO and that any required variances met the nine criteria for CPC approval for same. Ultimately, the CPC staff recommended approval of Ms. Henderson-Chandler's Application subject to four waivers and two provisos. The four waivers related to the lot's insufficient minimum area for non-residential uses; the lot's insufficient width for non-residential uses; the lack of the required three off-street vehicle parking spaces and two bicycle parking spots required for cultural facilities; and the lack of an EV charging station/parking space required for cultural facilities. One of the provisos related to the hours of operation, and the other stated, in pertinent part, that "[t]he Department of Safety and Permits shall issue no building permits or licenses for this project until final development plans are approved by the [CPC] and recorded with the Office of Conveyances."

## CPC Hearing and Recommendation

On August 27, 2024, the CPC considered ZD 050/24. At the outset, a CPC staff member informed the CPC that the CPC staff recommended approval subject to the above-mentioned two provisos and four waivers. During the hearing, Ms. Henderson-Chandler spoke in favor of her application. In pertinent part, Ms. Henderson-Chandler stated she would work with "neighbors at Metropolitan Baptist Church . . . at 943 N. Tonti . . . to use the space for parking when necessary so that the [Freedom House Museum does not] inconvenience its [other] neighbors." Ms. Henderson-Chandler pointed out that she lives at the property, such that she was "[r]eally committed to being a . . . good neighbor" and that "[a] lot of the issues that [the] neighbors have [were her] issues" too. One of the CPC members asked Ms. Henderson-Chandler whether the issues with using Oretha Castle Haley's name, image, and likeness had been resolved, and she responded in the affirmative. Two public commenters spoke in favor of approval in light of the site providing a space where visitors can learn about New Orleans history. Thereafter, the CPC voted (5-0) in favor of Ms. Henderson-Chandler's Application subject to the four waivers and two provisos as outlined in the CPC Staff Report, thereby recommending that the Council approve same.

## City Council Meetings

In October 2024, the City Council held two public hearings on Ms. Henderson-Chandler's Application.

### *October 10, 2024 Meeting*

At the Council's October 10, 2024 meeting, Councilmember Eugene Green ("Councilmember Green") moved to approve Ms. Henderson-Chandler's Application subject to the aforementioned four waivers and two provisos.

Thereafter, a representative for the CPC spoke, noting the CPC's recommended approval of Ms. Henderson-Chandler's Application subject to the four waivers and two provisos. Councilmember Green then explained that the CPC had received overwhelming support in favor of Ms. Henderson-Chandler's Application, with no comments in opposition at a neighborhood participation meeting and twenty-four comments in support submitted in writing.

Councilmember Green then opened the floor for public comments. Sundiata Haley, Oretha Castle Haley's son, spoke about the legacy issue and urged the Council to vote against Ms. Henderson-Chandler's Application. Like Sundiata Haley's statements, many of the online comments against Ms. Henderson-Chandler's Application were about the legacy issue and the opposition from the Haley family. However, seven online comments stated general opposition to Ms. Henderson-Chandler's Application. Additionally, John Castle, Oretha Castle Haley's brother, spoke to the Council and explained he was in support of the Freedom House Museum. The other public comments in favor of the Application, including Ms. Henderson-Chandler's, were about the importance of having a space for people to learn about the history and culture of New Orleans.

After hearing from the public, Councilmember Green moved for a deferral, whereupon the following colloquy occurred:

> [Councilmember-At-Large JP Morrell ("Councilmember-At-Large Morrell"):] I think that [it is] important to note for the record that there is a tremendous feeling in our community [that] people who are third parties com[e] . . . to profit off our culture. . . . I do not know what is the cultural significance of this location other than the person who lived there. And I [do not] know how you have a museum at a location and not reference or talk about the person who lived there, which is the sole historical significance of that location. Further, the united opposition of [Oretha Castle Haley's] family to [her] name being used and her legacy being used to profit is very problematic. . . .

[Councilmember Green:] In the application itself, . . . the name Oretha Castle Haley was not mentioned, but [I am] not naïve. Obviously this was [her] former residence, but [that is] not what [we are] deciding on today. [It is] not based on the use of the name Oretha Castle Haley. [It is] based on a request for a cultural center called the [F]reedom [H]ouse [M]useum which in its application does not mention [Oretha Castle Haley's] name. . . .

[Councilmember-At-Large Morrell:] How we treat this property sends a message to all the people in the city about that underlying rage people feel about people who are not from here profiting off the legacy of people that are here. And the only historic significance of this property is the person that lived there. . . .

. . . .

[Councilmember Lesli Harris ("Councilmember Harris):] I [do not] think this [F]reedom [House] [M]useum can exist without profiting [from] or using [Oretha Castle Haley's] image or likeness since she was so integral in the movement. For that reason, I would stand with denial if we go forward. . . .

Eventually, the Council voted to defer the matter.

***October 24, 2024 Council Meeting***

The Council took the matter up again at its October 24, 2024 meeting. At the outset, Councilmember Green cautioned Ms. Henderson-Chandler's Application needed to be viewed "as a land use matter, not a civil legal matter." In this latter regard, executive counsel for the Council explained that there was a preliminary injunction in place preventing Ms. Henderson-Chandler from using Oretha Castle Haley's name, image, and likeness. Councilmember Green further explained that he was recommending that the Council include a proviso enforcing any permanent injunctions issued by the court system. Executive counsel for the Council described this proviso as "an attempt to try and balance the interests" of Ms. Henderson-Chandler and Oretha Castle Haley's family. The executive counsel explained that with the proviso in place, if the judicial branch determined Ms.

8

Henderson-Chandler were to violate any injunctions in place, then this would constitute grounds for revocation of the conditional use permit.

The Council then heard public comments. Again, many of the in-person and online comments against Ms. Henderson-Chandler's Application were based on the Oretha Castle Haley legacy issue and the fact that the Haley family opposed Ms. Henderson-Chandler's Application. However, one person who publicly commented was Twila Franklin-Vining ("Ms. Franklin-Vining"), who explained she resides at 923 N. Tonti. Ms. Franklin-Vining stated that on June 3, 2024, she wrote a letter to the CPC expressing her opposition to Ms. Henderson-Chandler's Application. Therein and to the Council, Ms. Franklin-Vining expressed concern that the granting of Mr. Henderson-Chandler's Application would be detrimental to the area by intensifying traffic; minimizing parking space; and interfering with the right to peace and safety of the residents of the 900 block of N. Tonti. Regarding her first concern, Ms. Franklin-Vining explained the block already experiences high volumes of traffic due to a school and senior citizen housing facility. Turning to her second concern, Ms. Franklin-Vining stated she had already begun experiencing difficulty parking when she returned home in the evening after Ms. Henderson-Chandler began operating 917-919 N. Tonti as a historic landmark and rental property. Ms. Franklin-Vining further expressed concern about "stragglers" and recounted a break-in incident on the block. Ms. Franklin-Vining asked the Council to vote no on behalf of her and her children. Multiple commenters spoke in favor of the Council granting Ms. Henderson-Chandler's Application; and Ms. Henderson-Chandler also spoke to the Council once more in favor of her Application. Again, these comments largely noted the benefit of a facility where people could learn about the Civil Rights Movement.

Following, Councilmember Green moved to adopt the proviso, but none of the other councilmembers seconded this action. Councilmember-At-Large Morrell then recalled Ms. Franklin-Vining's concerns. With regard to Ms. Franklin-Vining's concern about parking, Councilmember-At-Large Morrell noted that while Ms. Henderson-Chandler had an agreement with the church for parking, "that [area is not] even developed as a parking lot yet." Councilmember-At-Large Morrell stated, "[A] consideration we have to have is when neighbors say" they have concerns. Councilmember Morrell concluded his discussion on this issue by saying that "[i]f we as a Council [do not] feel like those issues can be addressed through provisos then we [cannot] support a zoning ordinance." Then, Councilmember-At-Large Morell reiterated his concern about the Oretha Castle Haley legacy issue; but he explained this was his personal opinion and emphasized it was "not the reason" for how he planned to vote on Ms. Henderson-Chandler's Application. Then-Councilmember Oliver Thomas ("Councilmember Thomas") also spoke and expressed concern about the legacy issue.

Then, Councilmember Green moved to vote on ZD 050/40. Councilmember Green voted in favor of ZD 050/40. Then-Councilmember Joe Giarrusso ("Councilmember Giarrusso"), Councilmember Freddie King ("Councilmember King"), and Councilmember Thomas voted against it. Likewise, then-Councilmember-At-Large Helena Moreno ("Councilmember-At-Large Moreno") and Councilmember-At-Large Morrell voted against it. Councilmember Harris was not present and did not vote. Thus, Councilmember Green was the only vote in favor of Ms. Henderson-Chandler's Application. Councilmember-At-Large Moreno then moved to deny ZD 050/40, and Councilmembers Giarrusso, King,

and Morrell voted in approval of same. Councilmember Green voted against denial.

## Petition for Judicial Review

Following the Council's decision, on November 21, 2024, Ms. Henderson-Chandler filed her Petition for Judicial Review, naming the City and the Council as defendants. Therein, Ms. Henderson-Chandler alleged the Council violated the doctrine of separation of powers because its decision was based on concerns about a violation of the Allen Toussaint Legacy Act (i.e., a matter of statutory interpretation vested with the judicial branch rather than an executive branch action) rather than the health, safety, and welfare of the public. Ms. Henderson-Chandler asserted prejudice in that Councilmember Harris previously represented the Haleys as an attorney in trademarking "the Richard and Oretha Castle Haley Foundation for Education and the Arts" but did not disclose her relationship with the Haleys; did not recuse herself; and stated her position against Ms. Henderson-Chandler's Application at the Council's October 10, 2025 meeting. Further, Ms. Henderson-Chandler contended the comments by Councilmember-At-Large Morrell and Councilmember Thomas about the Oretha Castle Haley legacy issue during the October 24, 2025 meeting evidenced their lack of fairness and impartiality. Ms. Henderson-Chandler also argued there was no evidence to support a denial of her Application, with the Council instead basing its decision on the Oretha Castle Haley legacy issue.

## Trial Court Judgment and Reasons

The trial court held a hearing on Ms. Henderson-Chandler's Petition for Judicial Review in July 2025. Following the hearing, the trial court took the matter

under advisement. On August 11, 2025, the trial court issued its judgment, which stated, in pertinent part:

> **IT IS ORDERED, ADJUDGED, AND DECREED** that [Ms. Henderson-Chandler's] *Petition for Judicial Review* . . . is hereby **GRANTED**.

> **IT IS ORDERED, ADJUDGED, AND DECREED** that Judgment be entered in favor of . . . [Ms.] Henderson-Chandler[] and against . . . the City . . . and the . . . Council, finding that the October 24, 2024[] motion and denial of [ZD] 050/24[] by . . . the City . . . and the . . . Council was arbitrary and capricious, was an abuse of discretion, and was without consideration and was in complete disregard of the facts and circumstances of the application related to [ZD] 050/24.

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Judgment be entered in favor of . . . [Ms.] Henderson-Chandler[] and against . . . the City . . . and the . . . Council, finding that the October 24, 2024[] motion and denial of [ZD] 050/24[] [by] . . . the City . . . and the . . . Council exceeded [their] authority, jurisdiction, purview, and permitted discretion in violation of the Louisiana Constitution, the Louisiana Revised Statutes, the Home Rule Charter and City Ordinances.

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Judgment be entered in favor of . . . [Ms.] Henderson-Chandler, and against . . . the City . . . and the . . . Council, ordering that [ZD] 050/24 is **REVERSED** and . . . the City . . . and the . . . Council [are] to effectuate an ordinance granting the conditional use permit of . . . [Ms.] Henderson Chandler.

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that . . . the City . . . and the . . . Council are cast with the costs of these proceedings.

In its reasons for judgment, the trial court concluded the Council failed to apply the relevant zoning criteria outlined in the CZO; acted arbitrarily and capriciously; and rendered its denial in a manner that was not neutral, fair, and impartial. The trial court reasoned the Council improperly denied Ms. Henderson-Chandler's Application because of the Oretha Castle Haley legacy issue. The trial court found that "[e]ven considering the opposition letter read into the record by

12

[Ms. Franklin-Vining], denial of the . . . [A]pplication was clearly not done for the purpose of the public health, safety, and welfare of the community." The City and the Council's timely suspensive appeal to this Court followed.

## ASSIGNMENTS OF ERROR

On appeal, the City and the Council (collectively "Appellants") assert three assignments of error:

A.     The [trial] court erred in granting the Petition for Judicial Review, mandating the affirmative vote of a majority of all Councilmembers to adopt an Ordinance to effectuate the conditional use request, because the Council's decision to not grant the conditional use application is well within its legislative discretion.

B.     The [trial] court erred in granting [Ms. Henderson-Chandler's] Petition for Judicial Review because the Councilmembers' decision not to grant the conditional use request is supported by the administrative record and is neither arbitrary nor capricious.

C.     The [trial] court erred in ordering the . . . Council to pay the costs of the proceedings sua sponte.

After delineating the standard of review, we discuss each of these in turn.

## DISCUSSION

### Standard of Review

As this Court has previously explained:

"A challenge to a zoning decision in Louisiana is a *de novo* proceeding on the issue of whether the result of the legislation is arbitrary and capricious, and therefore a taking of property without due process of law." An appellate court reviews questions of law in a zoning matter under the *de novo* standard of review. Regarding factual findings in a zoning matter, this Court has explained that "[a] reviewing court does not consider whether the [trial] court manifestly erred in its findings, but whether the zoning board acted arbitrarily, capriciously or with any calculated or prejudicial lack of discretion."

*3000-3032 St. Claude Ave., LLC v. City of New Orleans*, 2022-0813, pp. 7-8 (La. App. 4 Cir. 6/22/23), 368 So.3d 1160, 1168 (alterations in original) (internal citations omitted).

## Assignment of Error Number One: Whether the Council's Decision Was Within Its Legislative Discretion

In their first assignment of error, Appellants assert: "The [trial] court erred in granting the Petition for Judicial Review, mandating the affirmative vote of a majority of all Councilmembers to adopt an Ordinance to effectuate the conditional use request, because the Council's decision to not grant the conditional use application is well within its legislative discretion." They then frame the issues as "whether the decision of the Councilmembers to adopt or not to adopt an ordinance falls within their discretionary legislative authority."

In her Application, Ms. Henderson-Chandler sought a conditional use permit. Section 4.3A of the CZO delineates the purpose of conditional use permits as follows:

> Within each zoning district, the use of land and structures are substantially uniform. However there are certain uses that, because of their unique characteristics, cannot be properly classified in certain districts without consideration, in each case, of the impact of those uses upon neighboring land and of the public need for the particular use at the particular location. These uses are allowed as conditional uses within the zoning districts.

Section 4.3B of the CZO explains one of the processes by which a conditional use application is initiated: "[a] property owner in the city . . . may file an application for a Conditional Use for the area of land for which the Conditional Use is requested."

In pertinent part, Section 3-101(1) of the New Orleans Home Rule Charter vests "[a]ll legislative powers of the City . . . in the Council." Thus, regarding the approval or denial of a conditional use application, Section 2.4 of the CZO provides that the Council has the power "[t]o make final decisions on conditional use applications (Section 4.3)." Additionally, Section 4.3C of the CZO states: "The

14

. . . Council, after receiving a recommendation from the [CPC], shall take formal action on requests for conditional uses, in accordance with Sections 5-406 and 5-407 of the City Charter." (Sections 5-406 and 5-407 of the New Orleans Home Rule Charter provide that the Council is to refer all proposed zoning ordinances to the CPC for its recommendation.)

Section 4.3.D.4 of the CZO delineates the subsequent "Action by the . . . Council":

> a. The . . . Council shall hold a public hearing in accordance with its rules and take action by motion of approval, modified approval, or denial sixty (60) days from receipt of a [CPC] recommendation. The . . . Council may not take official action upon any application requiring a recommendation of the [CPC] until the report of the [CPC] has been received or, if the [CPC] has failed to act by a vote of the majority of the [CPC] members, once the application has been forwarded to the . . . Council without recommendation.
>
> . . . .
>
> c. If the . . . Council takes action by motion of approval or modified approval, the . . . Council may forward the motion to the City Law Department for preparation of an ordinance. If the ordinance is then introduced by the . . . Council, the ordinance shall lay over for a minimum of twenty (20) days following introduction before the . . . Council may adopt it. The . . . Council's adoption of a motion shall not be construed as an approval of a zoning matter unless and until an ordinance is introduced and adopted in accordance with the Charter; introduction of an ordinance does not indicate the . . . Council's approval of a zoning matter. Failure by the . . . Council to take action on a zoning ordinance within ninety (90) days of the date the . . . Council took action by motion shall mean the application is denied.

Regarding ordinances, Section 3-111 of the New Orleans Home Rule Charter is titled "Legislation by Ordinance" and provides, in relevant part, that "[e]very act of the Council which is to become law shall be by ordinance . . . ." Then, Section 3-112(10) of the New Orleans Home Rule Charter states that "[n]o proposed ordinance shall be adopted except by the affirmative vote of a majority of all

15

members of the Council." In terms of the voting, Section 3-112(9) provides that "[v]otes at final passage shall be taken by ayes and nays and the names of the councilmembers voting for and against each proposed ordinance or amendment." Likewise, Rule 23 of the "Rules and Regulations of the Council" provides that "[n]o proposed ordinance . . . shall be adopted except by the affirmative vote of a majority of all members of the Council at a Council meeting."

As the foregoing demonstrate, the Council is vested with the legislative authority to enact ordinances affecting zoning. The process by which this occurs is: 1) the CPC makes a recommendation to the Council; 2) if the Council moves for approval, the Council forwards its motion to the City Law Department for preparation of an ordinance; 3) the Council can then introduce the ordinance; 4) the ordinance must lay over for a minimum of twenty (20) days following introduction before the Council can adopt it; and 5) then, a majority of the Councilmembers must vote in favor of the ordinance for it to be enacted. The Council is correct that "the decision of the Councilmembers to adopt or not to adopt an ordinance falls within their discretionary legislative authority." As the above-cited authorities demonstrate, neither the Council's motion to adopt an ordinance nor introduction of an ordinance constitutes approval of a zoning change. That only occurs once a majority of the Council approves the ordinance. *See Commodore v. City of New Orleans*, 2019-0127, pp. 14-15 (La. App. 4 Cir. 6/20/19), 275 So.3d 457, 469 (holding "[a] vote to adopt or deny a proposed ordinance . . . is within the . . . Council's discretion" and explaining that Sections 3-112(9) and (10) of the New Orleans Home Rule Charter "demonstrate the . . . Council's authority to accept or deny a proposed ordinance. The [New Orleans] Home Rule Charter does not mandate the . . . Council affirmatively vote in favor of an ordinance"); *De Latour*

16

*v. Morrison*, 213 La. 292, 297, 34 So.2d 783, 784 (1948) (stating that a reading of zoning law makes it "apparent that the adoption of an ordinance changing or amending the zoning law by a Yea and Nay vote constitutes final action on the part of the . . . [C]ouncil").

Moreover, all of this presupposes that the Council moves for approval and preparation of an ordinance in the first place. By contrast, in the matter *sub judice*, Ms. Henderson-Chandler's Application did not even make it past the first step in the process: the majority of the Councilmembers voted against the motion for preparation of an ordinance to effectuate her requested zoning change. In sum, the Council is correct that it had legislative discretion to accept or reject Ms. Henderson-Chandler's Application. Though the Council had discretion to reject Ms. Henderson-Chandler's Application, we must next consider whether the Council's decision was arbitrary or capricious.

### Assignment of Error Number Two: Whether the Council's Decision was Arbitrary or Capricious

In their second assignment of error, Appellants assert "[t]he [trial] court erred in granting [Ms. Henderson-Chandler's] Petition for Judicial Review because the Councilmembers' decision not to grant the conditional use request is supported by the administrative record and is neither arbitrary nor capricious." This Court has explained that "[z]oning is a legislative function," with "[t]he authority to enact zoning regulations flow[ing] from the police power of the various governmental bodies." *3000-3032 St. Claude Ave.*, 2022-0813, p. 13, 368 So.3d at 1171 (quoting *Palermo Land Co. v. Planning Comm'n of Calcasieu Par.*, 561 So.2d 482, 491 (La. 1990)). Because zoning is a legislative function and "legislative action [constitutes] a manifestation of the will of the people," courts are to grant "every

17

presumption of law and fact . . . in favor of [the] constitutionality" of a zoning decision. *Id.* at p. 14, 368 So.3d at 1171 (quoting *Four States Realty Co. v. City of Baton Rouge*, 309 So.2d 659, 666 (La. 1974)). Thus, "[c]ourts will not and cannot substitute their judgment for that of the legislative authority" because they are merely to serve "as a check on this legislative power . . . to ensure that there is no abuse of the power." *Id.* (quoting *Palermo Land Co.*, 561 So.2d at 492).

Additionally, "Louisiana jurisprudence provides that a 'presumption of validity attaches to all zoning decisions'" with the challenger bearing the burden of "overcom[ing] this presumption." *Id.* at p. 8, 368 So.3d at 1168 (quoting *Palermo Land Co.*, 561 So.2d at 490). Specifically, "the challenger must show an arbitrary[, capricious,] and unreasonable exercise of legislative authority in that 'a real or substantial relationship to the general welfare is lacking.'" *Id.* at p. 9, 368 So.3d at 1168 (quoting *Palermo Land Co.*, 561 So.2d at 490, 493). The Council's "legislative action is arbitrary, capricious and unreasonable" if the challenger demonstrates "that there was *no* room for a reasonable difference of opinion, and that there was *no* substantial evidence upon which the legislative action could have been justified." *Id.* (emphasis added) (quoting *Four States Realty Co.*, 309 So.2d at 665-66). This Court has defined "capriciously" as a legislative "conclusion reached with no substantial evidence to support it or a conclusion contrary to substantial competent evidence" and has defined "arbitrary" as the "disregard or failure to give proper weight to the evidence." *Id.* at p. 14, 368 So.3d at 1172 (quoting *Neighbors First for Bywater, Inc. v. City of New Orleans*, 2017-0256, p. 11 (La. App. 4 Cir. 12/13/17), 2017 WL 6350339, at *5). Only if the challenger demonstrated the foregoing, as well as the merits of her proposed zoning change, should "a court [subsequently] . . . substitute its judgment in place of the legislative

entity's decision in a zoning matter . . . ." *Id.* at p. 9, 368 So.3d at 1168-69 (first quoting *Terrytown Props., Inc. v. Jefferson Par.*, 416 So.2d 323, 325 (La. App. 5th Cir. 1982); and then citing *Kirk v. Town of Westlake*, 373 So.2d 601, 604 (La. App. 3d Cir. 1979)). Nonetheless, if "the propriety of a zoning decision is debatable, it will be upheld." *Id.* at p. 15, 368 So.3d at 1172 (quoting *Palermo Land Co.*, 561 So.2d at 493).

When considering a legislative zoning decision, the courts should not invalidate a decision simply because the Council did not include an explanation for its decision. *Id.* at p. 9, 368 So.3d at 1169. This is true when "the findings and reasons therefor are necessarily implicit in the record and the administrative determination is supported and sustainable by . . . the evidence," such that the Council need not "explicitly articulate that which is self-evident." *Id.* at p. 10, 368 So.3d at 1169 (quoting *Chaumont v. City of New Orleans*, 2020-0017, p. 12 (La. App. 4 Cir. 6/3/20), 302 So.3d 39, 50). Thus, concerning whether the legislative body's decision bore any relation to the health, safety, and welfare of the public, "[i]t is sufficient that the . . . [C]ouncil could reasonably have had such considerations in mind" even if the Council did not specify the same. *Id.* at p. 15, 368 So.3d at 1172 (emphasis removed) (quoting *Palermo Land Co.*, 561 So.2d at 491). In contemplating the health, safety, and welfare of the public, "the concerns of citizens and neighbors are an appropriate consideration" for the Council because "the decision-making process . . . exists for their benefit" and constitutes "a manner by which the legislative body learns the will of the people and determines what benefits the public good." *Id.* at p. 18, 368 So.3d at 1173-74 (first quoting *Palermo Land Co.*, 561 So.2d at 494-95; and then quoting *Toups v. City of Shreveport*, 2010-1559, p. 5 (La. 3/15/11), 60 So.3d 1215, 1218). The question of

19

whether the Council's decision "bears the requisite relationship to the health, safety[,] and welfare of the public is a factual question which must be determined from the evidence in the record." *Id.* at p. 15, 368 So.3d at 1172 (quoting *Palermo Land Co.*, 561 So.2d at 492).

Turning to the evidence in the record, the focus of much of the public and even the Councilmembers' commentary at the October 2024 Council meetings was certainly on the Oretha Castle Haley legacy issue. However, Ms. Henderson-Chandler's contention that this was the sole basis for the Council's decision is not supported by the record. Multiple of the online comments read into the record during the October 10, 2024 hearing were comments speaking generally against Ms. Henderson-Chandler's Application and without any reference to the legacy issue. Further, as summarized previously, Ms. Franklin-Vining voiced her concerns for the residents of 900 N. Tonti about traffic intensifying; parking space being reduced; and for their right to peace and safety. After the close of public comments, Councilmember-At-Large Morrell reminded his fellow Councilmembers about Ms. Franklin-Vining's concerns and contended the Council should not approve Ms. Henderson-Chandler's Application if it could not address these concerns. Further, with regard to the parking issue raised by Ms. Franklin-Vining, Appellants correctly observe in their brief that Ms. Henderson-Chandler's parking agreement with the church does not account for what will happen if visitors to her museum cannot park in the church parking lot because the church itself is holding services or hosting an event, an issue that is likely to arise. As delineated previously, the Council can and should consider the opinions of members of the public when deciding a zoning issue.

Additionally, while we recognize that Councilmember-At-Large Morrell spoke about the Oretha Castle Haley legacy issue, he emphasized that was "not the reason" for how he planned to vote on Ms. Henderson-Chandler's Application, instead merely constituting his personal feelings about her proposed project. Three of the other four councilmembers who voted against Ms. Henderson-Chandler's Application moving forward (Councilmember-At-Large Moreno and Councilmembers Giarrusso and King) did not express *any* reasons on the record for their vote. Jurisprudence is clear that the Councilmembers' failure to articulate their reasons does not constitute a basis for this Court to invalidate the decision. Moreover, because these Councilmembers did not state their reasoning, this Court certainly cannot attribute the Oretha Castle Haley legacy issue as the basis for their vote. To do so—as the trial court seemingly did—is to take a big leap analytically that is not supported by the record. Those councilmembers could reasonably have had such considerations as the health, safety, and welfare of the public in mind, especially based on Ms. Franklin-Vining's comments, for all the trial court and this Court knows. The only councilmember whose comments would lead one to reasonably believe he voted solely on the basis of the legacy issue was Councilmember Thomas. Even if one were to discount Councilmember Thomas' vote (so to speak) for that reason, the majority of the councilmembers present still voted against moving forward with Ms. Henderson-Chandler's Application (Councilmembers-At-Large Moreno and Morrell and Councilmembers Giarrusso and King), and this Court has no specific basis to discount their vote.

A presumption of validity attached to the Council's decision not to move forward with Ms. Henderson-Chandler's Application, and the record contains support that the Council could have had concerns for the public health, safety, and

21

welfare in mind. Accordingly, we conclude Ms. Henderson-Chandler failed to demonstrate the Council's decision was arbitrary, capricious, or an unreasonable exercise of legislative authority and thus did not overcome that presumption of validity. Ms. Henderson-Chandler did not show that there was no room for a reasonable difference of opinion and that there was no substantial evidence upon which the legislative action could have been justified. The fact that Ms. Franklin-Vining expressed her concerns and Councilmember-At-Large Morrell reiterated her concerns means there was room for a difference of opinion about the propriety of Ms. Henderson-Chandler's zoning request. As stated previously, when the propriety of a zoning decision is debatable, it will be upheld. Therefore, we reverse the trial court's judgment insofar as it found the Council acted arbitrarily and capriciously, abused its discretion, acted without consideration, and acted with complete disregard of the facts and circumstances of Ms. Henderson-Chandler's Application; ruled the Council exceeded its authority, jurisdiction, purview, and permitted discretion in violation of the Louisiana Constitution, the Louisiana Revised Statutes, the Home Rule Charter and City Ordinances; and ordered the Council to effectuate an ordinance granting a conditional use permit to Ms. Henderson Chandler.

### Assignment of Error Number Three: The Assessment of Costs Against the Council

Finally, Appellants contend the trial "court erred in ordering the City Council to pay the costs of the proceedings sua sponte." Appellants base their argument on La. R.S. 33:4727.

Louisiana Revised Statutes 33:4727 is titled "Board of adjustment; membership; powers and procedures; appeals from decisions." It provides, in pertinent part:

> E. (1) Any person or persons jointly or severally aggrieved by any decision by the board of adjustment of any officer, department, board, or bureau of the municipality, may present to the district court of the parish or city in which the property affected is located a petition, duly verified, setting forth that the decision is illegal, in whole or in part, specifying the grounds of the illegality. The petition shall be presented to the court within thirty days after the filing of the decision in the office of the board.
>
> . . . .
>
> (5) The court may reverse or confirm, wholly or in part, or may modify the decision brought up for review. Costs shall not be allowed against the board unless it appears to the court that it acted with gross negligence, in bad faith, or with malice in making the decision appealed from.

By its plain language, La. R.S. 33:4727 applies to the Board of Zoning Adjustment, not the Council.

Nonetheless, based on our foregoing analysis and reversal of the trial court's ruling that the Council acted arbitrarily and capriciously in deciding not to approve Ms. Henderson-Chandler's Application, we also necessarily reverse the trial court's assessment of costs. That is, the trial court assessed costs against the Council on the basis that it acted arbitrarily and capriciously, but we have determined this conclusion was not supported by the record. Thus, the trial court's basis for assessing costs also lacks support. Moreover, La. C.C.P. art. 2164 provides that "[t]he appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." The just, legal, and proper action for this Court to take is to reverse the trial court's assessment of costs because the record does not support a finding that the Council acted arbitrarily and capriciously.

## Councilmember Harris' Participation in the October 10, 2024 Meeting and Discussion

Lastly, we address an issue Ms. Henderson-Chandler raised before the trial court and in her brief to this Court. Specifically, Ms. Henderson-Chandler contends Councilmember Harris' participation in the October 10, 2024 meeting and discussion tainted the proceeding and prejudiced her because Councilmember Harris failed to disclose her relationship with the Haley family. (According to the record, Councilmember Harris helped them with a legal matter a decade ago.) Appellants counter that because Councilmember Harris was not present at the subsequent October 24, 2024 meeting and did not vote on Ms. Henderson-Chandler's conditional use request, there was no violation of Council rules. Appellants specify: "a councilmember is required to recuse themselves prior to a vote on the subject of discussion but is not precluded from discussion or debate on the matter." The Council further argues that "there is no evidence that demonstrates the consideration was not fair and impartial."

One of the Council's rules—Rule 12.B—is titled "Recusal," and it states:

Every member present when a question is stated shall vote unless the member asks to be recused because of a personal interest in the question or otherwise as required by state law, in which case the member shall not vote. That member is not prohibited from participating in discussion and debate concerning the matter, *provided that disclosure of the conflict or potential conflict is made part of the record in public prior to participation in the discussion or debate*, and prior to the vote that is the subject of discussion or debate.

(Emphasis added.) In light of the emphasized portion of the Rule, we find Appellants' stance is misguided. Based on our reading of the Rule, a councilmember can participate in the discussion and debate if the councilmember has already disclosed the conflict or potential conflict prior to same. The record

24

does not demonstrate that Councilmember Harris disclosed her potential conflict prior to the October 10, 2024 discussion of Ms. Henderson-Chandler's application.

Nonetheless, Councilmember Harris spoke only briefly at the October 10, 2024 meeting, and her comments focused on the Oretha Castle Haley legacy issue. We have already outlined that, based on the record, the other councilmembers could have had concerns for public health, safety, and welfare in mind when making their decision, not simply the legacy issue. Further, Councilmember Harris' comments were analogous to those from Councilmember Thomas (who had no conflict according to the record and spoke on the legacy issue) and to those of Councilmember-At-Large Morrell (who also had no conflict according to the record and spoke on the legacy issue but clarified his vote was not based on that issue). Thus, Councilmember Harris' comments were merely repetitive of the legacy concerns voiced by other councilmembers who did not have a conflict. If Councilmember Harris did not comport with Council Rule 12.B, her action did not rise to such a level so as to render the entire Council's decision arbitrary, capricious, or an abuse of discretion.

## DECREE

For the foregoing reasons, we reverse the trial court's August 11, 2025 judgment.

**REVERSED**